IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARRY L. CARTER AND | ) | |
| RANDI BEATTIE CARTER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 2:06-00022 JFC |
| v. | ) | |
| A.T. &T. BROADBAND/ | ) | |
| COMCAST, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

CONTI, District Judge

In this memorandum opinion, the court considers the motion for summary judgment filed by defendant AT&T Broadband/Comcast ("Comcast" or "defendant"), with respect to all claims asserted by plaintiffs Barry Carter ("B. Carter ") and Randi Carter ("R. Carter" together with B. Carter "plaintiffs") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et seq.* ("Title VII") and the Pennsylvania Human Relations Act, 43 PA. CONST. STAT. ANN. §§ 951 *et seq.* ("PHRA"). In the complaint, B. Carter asserts claims against Comcast of race discrimination and retaliation under Title VII and the PHRA. R. Carter asserts third-party retaliation claims under Title VII and the PHRA against Comcast based upon B. Carter's protected activity. After considering the joint concise statement of material facts ("J.C.S.") and the submissions of the parties, the court will grant summary judgment in favor of defendant with respect to all claims asserted by plaintiffs for the reasons set forth below.

<u>**Factual Background and Procedural History**</u>

Plaintiff B. Carter is an African-American male. (Pls.' Compl. ¶ 36.) B. Carter became an employee of Comcast on February 21, 2000, when he accepted a position as a customer service sales representative ("CSSR"). (J.C.S. ¶ 1.) Thereafter, he moved to a position in the telephone repair department. (<u>Id.</u>) On June 10, 2001, he became a CSSR or agent in Comcast's retention department. (<u>Id.</u>) During his employment at Comcast, B. Carter was chosen to perform various supervisory tasks and worked as a "help desk," where employees would ask his assistance in performing tasks. ( Barry Carter Dep., Mar. 21, 2007 "B. Carter Dep." 186:1-8; 18-25.)

In June 2001, upon moving to the retention department, B. Carter was supervised by Maura Booher ("Booher"). (J.C.S. ¶ 1.) Agents in the retention department answer incoming calls from customers who want to disconnect or downgrade their existing cable service with Comcast. (<u>Id.</u> ¶ 11.) It is the job of the retention agent to convince the customer not to disconnect or downgrade their cable service. (<u>Id.</u>) The job performance of agents in the retention department is measured by the agent's ability to meet certain departmental goals, which are all related to the number of customers the agent was able to retain or save. (<u>Id.</u> ¶ 12.) Agents are also evaluated based on their telephone statistics in that they are expected to spend 78% of their time speaking with customers. (<u>Id.</u>) Agents who fail to meet these departmental goals are subject to Comcast's progressive discipline procedures. (<u>Id.</u>)

The first step in Comcast's progressive discipline procedure is a "coaching" session by the agent's supervisor for the initial failure to meet one of the departmental goals or for attendance-related matters. (<u>Id.</u> ¶ 13.) Continued failure to meet the same departmental goal or

violation of an attendance policy results in a verbal warning, followed by a written warning, final written warning, and then termination for repeated failure to meet a particular goal. (Id.) At Comcast, disciplinary actions are measured on a rolling twelve-month calendar. (Id. ¶ 14.) The rolling twelve-months begin with the first occurrence of a behavior warranting disciplinary action. (Id.) Supervisors are permitted to bypass certain steps in the progressive discipline procedures in certain instances. (Id. ¶ 15.) For example, in the retention department, if an agent is found to be deliberately avoiding taking calls from customers, the agent may receive an immediate final written warning and a one-day suspension. (Id.)

On or about February 15, 2002, B. Carter met with Comcast's human resources representative, Bernice Gillium ("Gillium"), and initiated a complaint of discrimination for being denied a promotion opportunity allegedly based on his race. (Pls.' Compl. ¶ 36.) During this conversation, no other individual was present in the room. (B. Carter Dep. 81:5-12.) In addition to speaking with Gillium, B. Carter spoke with Corky Croft, another human resources employee, and emailed Cynthia Hilquist, the vice president of Comcast. (Id. 79:1-8.) B. Carter filed a complaint with the Pennsylvania Human Relations Commission ("PHRC"), which cross filed the complaint with the Equal Employment Opportunity Commission ("EEOC"). (Id. 80:19.)

Later in February 2002, a supervisor position in the outbound sales department was advertised on Comcast's internal website. (J.C.S. ¶ 3.) Comcast employees interested in the position were instructed to apply online and include a copy of their resume. (Id.) A list of all applicants and their resumes were forwarded to Cathy Kopanic-Enright ("Enright"), the outbound sales manager, to select a candidate to fill the position. (Id.) Enright interviewed the various candidates, including B. Carter, and because the job required analysis of reports and calculation

of commissions, each candidate was given a short test requiring him or her to demonstrate basic math skills.  (Id. ¶ 4.)

Based upon the interviews and results of the mathematics test, Enright testified Guinevere Mullin ("Mullin") was selected to fill the position in April 2002 because she scored higher than B. Carter on the exam.  (Id. ¶ 5.)  After  making that selection, Enright met individually with all the Comcast employees who applied for the position, including B. Carter. (Id. ¶ 6)  At the time she made her selection, Enright claims that she had no knowledge that B. Carter had made an internal complaint of discrimination.  (Enright Decl. ¶ 8.)

In March 2002, a second supervisor position was created in the retention department. (J.C.S. ¶ 7)  Mary Ann Spirnak ( "Spirnak"), the manager of the retention department, was charged with selecting a candidate to fill this position, and interviewed eleven of the seventeen candidates that applied.  (Id.)  The candidate pool consisted of Caucasian and African-American men and women.  (Id.)  B. Carter applied for this position and was interviewed by Spirnak  (Id.) Throughout the interview process, Spirnak averred she sought an applicant who had supervisory experience, was a good performer, possessed knowledge of the retention department, and had good statistics with respect to saving/retaining customers.  (Spirnak Decl. ¶ 6.)  Initially, Spirnak offered the position to Leighton Seawright, an African- American Comcast employee, who was a supervisor in the customer service department. (J.C.S. ¶ 8.)  Seawright declined the position by reason  of the hours he would be required to work.  (Id.)

Spirnak's next choice was Darlene Bauer ("Bauer"), a Caucasian female, who was one of the original members of the retention department.  (Id. ¶ 9.)  Spirnak believed that Bauer was more qualified for the position than B. Carter because Bauer had been considered a "lead

amongst her peers," had already assisted with some supervising responsibilities, and had a higher over all save rate average than B. Carter. (J.C.S.¶ 9; Spirnak Decl. Exs. B, C.) B. Carter contends that Bauer was not considered to be a lead amongst her peers and did not possess more supervisory experience. (J.C.S. ¶ 9.) At the time Spirnak offered the position to Bauer, she testified that she had no knowledge of any discrimination complaint made by B. Carter. (J.C.S. ¶ 10.)

In April 2002, Booher learned that two Comcast retention agents, Thomas Donovan and Ashley Zearott had been deliberately avoiding taking customer calls which is referred to as "call avoidance." (J.C.S. ¶ 16.) Donovan and Zearott were given final written warnings and a one-day suspension. (Id.) In late May or early June 2002, Booher learned that B. Carter had also avoided taking customer calls. (Id. ¶ 17.) B. Carter was given a final written warning and a one-day suspension. (Id.) When Booher met with B. Carter on June 5, 2002 to inform him of his suspension, B. Carter told her about the internal discrimination complaint he had filed with Comcast's human resources department earlier that year. (Id.) In addition to his suspension, on November 24, 2003, B. Carter received coaching for a tardy/shift interruption, along with a variety of other performance-related issues. (Def.'s Exs. D9-D34.)

In May 2003, Ranata Roberts ("Roberts"), an African-American agent in the retention department, was promoted to an open supervisor position in that department, and became B. Carter's immediate supervisor. (J.C.S. ¶ 18.) B. Carter had trained Roberts at one point in time, in an effort to raise her save rate performance and he performed at the company's required performance rating. (B. Carter Dep. at 56:22.) Beginning in the fall of 2003, Roberts claims that B. Carter's performance began to take a sharp decline. (J.C.S. ¶ 19) During this time, B. Carter

was having difficulty understanding how to classify correctly his customers' calls. (Pls.' App. A at 57.) B. Carter alleges that he failed to achieve Comcast's performance criteria because his supervisors refused to explain his shortcomings or address his concerns. Roberts issued B. Carter a number of disciplines for his continuing failure to meet the retention department's goals with respect to both save rate performance and telephone statistics. (J.C.S. ¶ 20.) In a corrective discipline memorandum dated November 10, 2003, for the monthly period of September 22, 2003 through October 21, 2003, B. Carter's monthly save rates were 38.7% (video downgrade), 23.7% (video disconnect), 21.1% (HSD disconnect) and the department's minimum requirements were respectively 55% (video downgrade), 30% (video disconnect), and 35% (HSD disconnect). As a result, he was given a verbal warning and continued performance monitoring. Following the November 10, 2003 disciplinary action, B. Carter received six more discipline memorandums for failing to meet the department's minimum requirements over the following two months. (B. Carter Dep. Exs. 21-29.)

As a result of B. Carter's continued failure to meet the departmental goals, by letter dated February 6, 2004, he was offered mandatory two weeks of training by Booher, who was now the manager of the retention department, or face termination. (J.C.S. ¶ 21.) B. Carter accepted the training. (Id.) After the training, B. Carter was still unable to meet the departmental goals with respect to the save performance rate and telephone statistics. (Id. ¶ 22.) Due to his job related stress, B. Carter was hospitalized. (B. Carter Dep. 90:17; 95:20.) On August 26, 2004, B. Carter met with Roberts, Booher, and Corky Croft. (J.C.S. ¶ 23.). At this meeting, B. Carter was terminated and presented with his final corrective action discipline memorandum describing the reasons for his termination. (Id.)

R. Carter began her employment with Comcast on June 12, 2000 as a data entry clerk and married B. Carter in October 2001. (Id. ¶ 24.) In March 2001, R. Carter moved to the retention department, and in June 2002 became pregnant. (J.C.S. ¶ 24.) Because complications occurred during her pregnancy, R. Carter applied for and was approved to take a leave pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* (J.C.S. ¶ 27) on an intermittent basis starting in June 2002. (J.C.S. ¶ 26.) In early 2002, R. Carter was confined to bed rest and her twelve-week FMLA leave expired before the end of December 2002. (J.C.S. ¶ 27.) Upon returning as an agent in the retention department in March 2003, R. Carter was absent from work because she could not make childcare arrangements. (J.C.S. ¶ 30.) By letter dated March 28, 2003, R. Carter was told that Comcast considered her to be on unapproved leave and that if she did not report to work on March 31, 2003, she faced possible termination; she did not return to work. (J.C.S.¶ 31.) By letter dated March 31, 2003, Comcast gave R. Carter another chance to save her job if she returned to work by April 2, 2003; she again did not return to work. (J.C.S. ¶ 32.) By letter dated April 7, 2003, R. Carter was advised that her employment with Comcast was terminated because of her failure to return to work. (J.C.S. ¶ 33.)

Plaintiffs timely filed complaints with the PHRC and the EEOC, respectively, under the PHRA and Title VII, claiming illegal job discrimination and retaliation for the filing of the discriminatory complaints. Having received a right to sue letter, on January 1, 2006, plaintiffs commenced the above-captioned civil action in the Court of Common Pleas of Allegheny County. In the complaint, B. Carter alleged that he was illegally discriminated against when in 2002 Comcast failed to promote him to two separate supervisory positions. B. Carter also claims that Comcast illegally retaliated against him when he filed his internal racial discrimination

complaint with the company in 2002. R. Carter claims that she was terminated in retaliation for her husband's discrimination complaint. The action was removed by defendant to this court, and on September 20, 2007, defendant filed the present motion for summary judgment.

## **Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249.

The Supreme Court held in Celotex Corp v. Catrett, 477 U.S. 317 (1986), that:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

Id. at 324 (emphasis added). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50

(citations omitted).

<u>**Discussion**</u>

I.    **B. Carter's Claims**

    A.    **Discrimination Claims**

        1.    **Burden-Shifting Framework**

Title VII[1] was enacted to prohibit employers from discriminating against employees with

respect to compensation, terms, conditions, or privileges of employment. <u>Texas Dept. of Cmty.</u>

<u>Affairs v. Burdine</u>, 450 U.S. 248, 259 (1981). The Supreme Court recognized that it is often

difficult for a plaintiff to prove that an employer acted with "conscious intent to discriminate."

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). One manner in which a plaintiff can

meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for

the challenged action is not the true reason, but rather was a pretext for unlawful discrimination.

<u>Burdine</u>, 450 U.S. at 253.

In <u>McDonnell Douglas</u>, the Supreme Court developed the now familiar burden-shifting

framework for courts to utilize as a tool in analyzing disparate treatment claims. The <u>McDonnell</u>

<u>Douglas</u> framework requires a plaintiff alleging a violation of Title VII to first establish a prima

facie case of discrimination. The prima facie case, the elements of which depend upon the kind

of claim the plaintiff is alleging, "eliminates the most common non-discriminatory reasons for

the plaintiff's rejection." <u>Burdine</u>, 450 U.S. at 254. In so doing, "the prima facie case 'raises an

---

[1] The standards under Title VII and the PHRA are the same. Plaintiffs' claims under Title VII
will be discussed and the resolution of the Title VII claims will be dispositive of the PHRA
claims. <u>See</u> <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 413, 919 (3d Cir. 1997)(applying Title VII
analysis to PHRA claims).

inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'"  Id. (quoting Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment decision.  Simpson v. Kay Jewelers, Division of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998).  The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. . . ."  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (emphasis added) (citations omitted).

Once the defendant offers a legitimate non-discriminatory reason for the challenged conduct at issue, "'the McDonnell Douglas framework - with its presumptions and burdens' - disappear[s] . . .  and the sole remaining issue [is] 'discrimination *vel non*,'. . . ."  Reeves v. Sanderson Plumbing Products., Inc., 530 U.S. 133 (2000) (quoting U.S. Postal Serv. v. Aikens, 460 U.S. 711 (1983)).  A plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.  Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

### 2.      Prima Facie Case

To state a claim for discrimination under Title VII, a plaintiff must show by a preponderance of the evidence that: (1) he or she was a member of the protected class; (2) he or

she was qualified for the position for which she applied; (3) he or she was subject to adverse

employment action despite being qualified; and (4) under circumstances that raise an inference of

discriminatory action, the employer continued to seek out individuals with qualifications similar

to the plaintiff's qualifications to fill the position.  McDonnell Douglas, 411 U.S. at 802;

Burdine, 450 U.S. at 253;  Sarullo v. U. S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).

     In this case, B. Carter presented sufficient evidence to establish a prima facie case of race

discrimination.  First, it is undisputed that he is an African-American and is a  member of a

protected class for the race discrimination claims. Second, B. Carter was qualified for the two

positions for which he applied based upon his performance reviews, evaluations, and supervisory

experience while employed at Comcast. Third, it is undisputed that he experienced adverse

employment actions by not being hired for the managerial positions that opened in 2002.  Fourth,

it is undisputed that Comcast hired two Caucasian females with less supervisory experience than

B. Carter.  Based upon these facts, viewed in the light most favorable to B. Carter, sufficient

evidence was presented to support an inference that an employment decision may have been

based upon an illegal discriminatory criterion.

### 3.  Defendant's Business Reasons

     Since B. Carter presented sufficient evidence to support a prima facie case, the court

must address the other factors in the McDonnell Douglas framework.  Once a plaintiff has

established a prima facie case the burden shifts to the defendant to rebut the presumption of

discrimination by producing evidence that the plaintiff was rejected, or someone else was

preferred, for reasons that are legitimate and non-discriminatory.  Burdine, 450 U.S. at 254.  An

employer satisfies its burden of production by introducing evidence which, taken as true, would

permit the conclusion that there was a reason that was not discriminatory for the adverse

employment decision.  <u>Fuentes</u>, 32 F.3d at 763; see <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993).  It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers.  <u>Burdine</u>, 450 U.S. at 254;  see <u>Bd. of Trs. of Keene State Coll. v. Sweeney</u>, 439 U.S. 24, 25 (1978).

In this instance, defendant offered legitimate business reasons for the two separate adverse employment actions against B. Carter. The first adverse employment action was that B. Carter was not promoted to a supervisory position in 2002.  In response, the first legitimate reason offered by Comcast is that Mullin, who was hired for the supervisor position in the outbound sales department in 2002 over B. Carter, scored higher on the mathematics test that was administered to each candidate during the application process. The second adverse employment action was that he was not promoted to a second supervisory position also in 2002. The legitimate reason offered by Comcast for this decision was that Bauer, who was hired for the supervisor position in the retention department in 2002 over B. Carter, was considered to possess leadership qualities in the eyes of her co-workers and had already been assisting with supervisory responsibilities at Comcast. B. Carter disputes that Bauer was seen as a leader by her peers. At this stage in the analysis, the court will not weigh or judge defendant's explanation, and its enough for the employer to meet its relatively light burden by simply articulating a legitimate business reason. <u>Burdine</u>, 450 U.S. at 254. The court concludes that  reasons proffered by defendant satisfy defendant's burden of production under the <u>McDonnell Douglas</u>  framework.

## 4. Pretext

The last part of the analysis requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence

that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)."

Fuentes, 32 F.3d at 763.  Once an employer has stated a legitimate, non-discriminatory reason for

the adverse employment action, the plaintiff in order to survive summary judgment must satisfy

at least one of the two prongs articulated by the United States Court of Appeals for the Third

Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from
> which a fact-finder could reasonably either (1) disbelieve the employer's
> articulated legitimate reasons; or (2) believe that an invidious
> discriminatory reason was more likely than not a motivating or
> determinative cause of the employer's action.

Id. at 764.

### a.    Prong One

A plaintiff must submit evidence that could cause a reasonable fact-finder to discredit the

employer's articulated reason for the adverse employment action in order to overcome summary

judgment and bring her case to trial.  To discredit the employer's articulated reason, the plaintiff

does not need to produce evidence that necessarily leads to the conclusion that the employer

acted for discriminatory reasons, Sempier v. Johnson & Higgins, 45 F.3d 724, 764 (3d Cir.

1995), nor produce additional evidence beyond her prima facie case.  Fuentes, 32 F.3d at 764.  A

plaintiff must, however, demonstrate such:

> "weaknesses, implausibilities, inconsistencies, incoherencies [sic], or
> contradictions in the employer's proffered legitimate reasons [such] that a
> reasonable fact-finder could rationally find them 'unworthy of credence'"
> and hence infer that the proffered nondiscriminatory reason "did not
> actually motivate" the employer's action. [Fuentes, 32 F.3d] at 764-65
> (quoting [Ezold v. Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509,
> 531 (3d Cir. 1992)]).

Simpson, 142 F.3d at 644.

The question asked in prong one of the Fuentes test is not whether the employer made the

best, or even a sound, business decision; it is whether the real reason for the adverse result

13

suffered by the plaintiff is discrimination.  Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109

(3d Cir. 1997).  The court is neither permitted to get involved in the subjective business decisions

of the employer, nor set its own employment standards for the employer, unless there is evidence

of discrimination.  Ezold, 983 F.2d at 527.  "Furthermore, the court should not examine the issue

of whether the employee has skills in an area other than that identified by the employer as the

basis for his or her termination, because the court then would be impermissibly substituting its

own business judgment for that of the employer."  Moorer v. Verizon Communications, Inc.,

Civ. No. 03-1265, 2005 WL 2807140 (W.D. Pa. Oct. 27, 2005), aff'd, 211 Fed.App'x 98 (3d Cir.

2006).

   "An employment decision that would create a problem under prong one will likely turn

on whether the stated reason for termination is so implausible that a fact-finder could not believe

it [to be] worthy of credence."  Orenge v. Veneman, Civ. No. 04-297, 2006 WL 2711651, at *15

(W.D. Pa. Sept. 20, 2006); see Menta v. Cmty. Coll. of Beaver County, 428 F.Supp. 2d. 365, 374

(W.D. Pa. 2006).  For example, in Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d

Cir. 1995), the plaintiff was fired due to deficient sales performance.  The evidence of record,

however, disclosed that the plaintiff received a bonus three months prior to his termination and

that he was the only sales employee in his region to have received such a bonus.  The court held

that, where the primary measure of the employee's performance was his sales, and where he was

the leading salesperson in the region, the employer's stated reason for his termination was

"contradictory to [its] admission that the most important standard of job performance is sales."

Id. at 332.  According to the court, "[a] fact-finder could find it implausible that Quaker State

would have fired Brewer for such deficiencies when he was successful in the sole area identified

by Quaker State's own performance incentive program - sales."  Id.

Sempier is another case in which an employer stated the plaintiff was terminated because of poor performance causing the company to restructure the nature of his responsibilities. The evidence of record, however, disclosed that (1) the plaintiff never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of the plaintiff's deficiencies. Sempier, 45 F.3d at 731-33. Thus, there was evidence on the record that a reasonable fact-finder could conclude that the reason given in Sempier by the employer was a pretext for age discrimination. Id. at 732-33.

In this case, B. Carter offers two primary "inconsistencies and contradictions" in an attempt to satisfy the first prong of the Fuentes test. First, B. Carter claims that he had significantly more supervisory experience than the applicants who were selected to fill the managerial positions for which he applied in 2002. As evidence, B. Carter points to his training of a supervisor (Roberts) on how to raise her save rate performance and his working as a "help desk" where employees sought his assistance in reaching and maintaining the retention department's goals and statistics. He argues that based upon his experience, he should have been the natural choice for promotion.

Second, B. Carter claims that he always had average or above performance ratings while working for Comcast and if they fell below average, it was because he was unsure of how to perform his job functions. B. Carter alleges that because his superiors knew of his internal discrimination complaint, they did not specifically address his concerns of how to categorize customers' calls, prohibiting him from conforming to Comcast's standards.

Here, while the two "inconsistencies and contradictions" raised by B. Carter are directed at the legitimate business reasons offered by Comcast, there is insufficient evidence to support

his claims. With regard to the first position, Mullin, the individual selected for the manager in the outbound sales department was chosen because she scored higher on a mathematics exam administered during the application process. As described in <u>Moorer</u>, this court is not to substitute its own business judgment for that of the employer. B. Carter failed to adduce evidence that the use of the mathematics score was pretextual, e.g., he did not show that the test scores were unrelated to an ability to perform the position or that the test scores were otherwise flawed.

Bauer, the candidate who was selected to fill the second position as manager of the retention department, was one of the original members of that department. Comcast employees considered her a leader amongst her peers, and she had already been assisting with supervisory responsibilities. B. Carter contended otherwise, but he presented only his beliefs and no other evidence to support his conclusions. <u>See</u> <u>Dowling v. Citizens Bank</u>, No. 2:05cv914, 2007 WL 2752178 (W.D. Pa Sept. 19, 2007); <u>Knoll v. Sotheastern Pa. Transp. Auth.</u>, Civ. A. 01-2711, 2002 WL 31045145 (E.D. Pa.Sept. 11, 2002 )(holding that unsubstantiated beliefs alone is not enough to raise more than a scintilla of evidence that defendant's expressed reason was pretextual); <u>Lacey v. Dana Corp.</u>, Civ.A. 97-6403, 1998 WL 966013 (E.D. Pa. Nov. 20, 1998); . In addition, Bauer had a higher save rate percentage higher than B. Carter. B. Carter failed to proffer any evidence that would indicate that Bauer did not in fact have a higher save rate average or that the save rate average was not a valid consideration in the promotion process.

B. Carter contends that his performance at Comcast had always been average or better than average; and if his scores fell below average, it was because he was unsure how to categorize correctly customers' calls. B. Carter alleges that the reason his scores dropped was pretextual in nature; yet, he has offered no evidence as support. It is well recognized that prior

satisfactory evaluations alone cannot establish that later unsatisfactory evaluations are pretextual. See Billet v. Cigna Corp., 940 F.2d 812, 826-27 (3d Cir. 1991)(to hold that prior good evaluations alone establish pretext would be to hold that things never change, a proposition clearly without basis in reality); Dunman v. Equitable Resources Inc., Civ.A. No. 05-1113, 2006 WL 2794551 (W.D. Pa. Sept. 27, 2006)(holding that a plaintiff's sudden drop in performance standing alone does not establish pretext). The failure to promote an employee with average performance ratings over another employee does not, considered alone, rise to the level of pretext needed under the Fuentes test. If, for example, B. Carter had shown that the individual who was promoted over him had the same or lower ratings, there would have been evidence of pretext by Comcast. See Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995)(where the plaintiff was a leading salesperson in the region and received a bonus prior to his termination, the court held that a fact-finder could find it impossible that the employer would have fired an employee that was successful by the company's own standards, and as a result pretext existed). In this case, while B. Carter's performance may have been average or better than average, it simply reflects that B. Carter was performing to the standards of Comcast. B. Carter did not offer any evidence to dispute defendant's assertion that Bauer's save percentages and performance ratings were better than B. Carter's. B. Carter's average or better than average performance ratings, under these circumstances, are not evidence of discriminatory pretext by Comcast. B. Carter did not satisfy his burden of showing that Comcast's reason was pretextual under the first prong of Fuentes.

     **b.**    **Prong Two**

     The court must next examine the second prong of the Fuentes framework to determine if plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely

than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that could allow a fact-finder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. Simpson, 142 F.3d at 644-45. Relevant evidence that could be relied on in the evaluation of this prong includes: (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645.

### (i) Evidence of previous discrimination against plaintiff

B. Carter points to his employer's failure to promote as one instance in an alleged repeated pattern of harassing, discriminatory acts by Comcast. B. Carter notes that he possessed past supervisory experience and had average or above average performance; yet, he was still not selected to fill the supervisor positions within the retention department in 2002. He alleges that the individuals who were eventually chosen to fill the positions over him were less qualified and had lower performance rates, which shows an illegitimate discriminatory motive. Under the circumstances of this case, the court does not find this argument persuasive. Importantly, B. Carter did not offer evidence to support his claims. B. Carter did not present evidence that either candidate chosen for the managerial positions was less qualified or had lower performance ratings. B. Carter does not present sufficient evidence of previous discrimination for a reasonable jury to find in favor of plaintiff with respect to this factor.

### (ii) Whether the employer has discriminated against other people within plaintiff's protected class or another protected class

On the record before the court, B. Carter did not adduce evidence that defendant discriminated against other African-Americans. On the contrary, Comcast proffered evidence that

18

with respect to the selection in March 2002 of a candidate for the supervisor position, Spirnak initially offered the position to Leighton Seawright, an African-American male, who already held a supervisory position in the customer service department. Based upon the undisputed evidence of record, viewing all disputed facts in favor of B. Carter, and drawing all reasonable inferences in favor of B. Carter, the court concludes that a reasonable jury could not find in favor of B. Carter with respect to this factor.

### (iii) Whether the employer has treated more favorable similarly situated persons not within the protected class

B. Carter contends that Mullin and Bauer, Caucasian females, were similarly situated and more favorably treated. Although both women were eventually chosen for the supervisory positions in 2002, B. Carter claims that because he worked as a "help desk", he had more knowledge of how best to carry out job functions as a supervisor. This skill, however, was not identified as a necessary skill for supervisors employed by Comcast. "Help desk" experience does not implicate pretext with respect to the legitimate business reasons proffered by Comcast. B. Carter's experience as a help desk does not raise an inference that Comcast's reliance on a mathematics exam score and interview performance, or the experience of an original member of the retention department, with supervisory experience, and higher save rate averages than B. Carter were pretextual. As this court noted in Moorer v. Verizon Communications Inc., "the court should not examine the issue of whether the employee has skills in an area other than that identified by the employer as the basis for his or her termination, because the court then would be impermissibly substituting its own business judgment for that of the employer." Moorer, 2005 WL 2807140 at *16.

The reason that defendant offered for not promoting B. Carter in 2002 was because the applicants chosen were better qualified, or had higher save rate percentages. Although Mr. Carter

may have been employed at Comcast as a "help desk" where individuals sought his advice in increasing their job performance, there are no allegations that he scored higher on his math test or performed better during his interview than Mullin. Additionally, B. Carter did not allege that he had a higher save rate performance than Bauer, simply that he had average scores for the company. He did not present evidence sufficient to enable a reasonable jury to conclude that defendant treated non-protected class members more favorably than those within the protected class.

B. Carter did not present sufficient evidence of pretext under the second prong of the Fuentes framework. He did not show that discrimination was more likely than not a cause for the employer's adverse actions or point to evidence with sufficient probative force that could allow a reasonable fact-finder to conclude that his race was a motivating or determinative factor in Comcast's employment decisions.

**B.      B. Carter's retaliation claim.**

Retaliation claims brought under Title VII follow the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989). Under the first step in this framework, a plaintiff has the initial burden of establishing the following prima facie case: (1) the plaintiff engaged in protected activity; (2) the plaintiff's employer took adverse action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 286 (3d Cir. 2001).

It is undisputed that B. Carter engaged in protected activity satisfying the first element of the prima facie case by filing the February 12, 2002 internal discrimination complaint with

Comcast's human relations department. The court will therefore evaluate each of B. Carter's allegations of retaliatory adverse actions with respect to the second and third elements of the prima facie case.

The first adverse action that B. Carter alleges is a generalized complaint about a "continuing and on going pattern of adverse actions" from the time he filed his complaint until his termination. (Pls.' Compl. ¶ 44.) B. Carter further alleges that the ongoing and continuous retaliations materialized into a hostile work environment.

The Supreme Court has clarified what a plaintiff must show to satisfy the second prong of a retaliation claim under Title VII. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). In the context of a retaliation claim, a plaintiff is not required to show an "adverse employment action" that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Moore v. City of Philadelphia, 461 F.3d 331, 341-42 (3d Cir. 2006)(quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997)). Likewise, employees claiming retaliation by harassment and a hostile work environment are not required to show harassment that "was 'severe or pervasive enough to create a hostile work environment' that would violate the anti-discrimination provision of Title VII in order to violate Title VII's protection from retaliation." Id. (quoting Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006).

In Burlington Northern, the Supreme Court distinguished the statutory language and purposes of the discrimination and retaliation provisions of Title VII and determined that the retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern, 548 U.S. at 62-63. The Supreme Court concluded that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-

21

related retaliatory acts and harm." Id. at 64.  The Supreme Court articulated a new standard and held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 65.  In explaining a "materially adverse" action, the Supreme Court noted the importance of separating "significant from trivial harms" and went on to explain:

> Title VII, we have said, does not set forth "a general civility code for the American workplace." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998); see Faragher, 524 U.S. at 788 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'"). An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "'snubbing' by supervisors and co-workers" are not actionable under § 704(a)). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. Robinson, 519 U.S. at 346. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. Id. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual § 8, p 8-13.

Id. at 68.

In this case, B. Carter did not proffer any evidence to support his allegation of a hostile work environment, except for the statement that he noticed his superiors acting "negatively" toward him.  While B. Carter contends that the adverse actions were ongoing, there is insufficient evidence of record to support his contention.  The only evidence adduced is the vague statement that B. Carter "began to notice a negative change in his supervisor's disposition toward him." (Pls.' Compl. ¶ 38.)  This ambiguous statement alone does not provide evidence of an adverse

employment action. This vague statement does not indicate that he endured intentional and regular discrimination. See Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990)(holding that harassment is pervasive when incidents of harassment occur either in concert or with regularity) (citing Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987). B. Carter's claims of retaliation allegedly creating a hostile work environment are not sufficient to meet the standard enunciated by the Supreme Court in Burlington Northern, and would not "have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern, 548 U.S. at 68. As the Supreme Court has noted, "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id.

B. Carter asserts three additional adverse employment actions allegedly related to his retaliation claim, including the failure to promote, receipt of a one-day suspension, and termination of his employment. Under these circumstances, for purposes of this summary judgment opinion, these three actions qualify as adverse employment actions under the standard articulated by the Supreme Court in Burlington Northern, and satisfy the first two elements of the prima facie case. The issue with respect to these actions is whether B. Carter presented sufficient evidence of the third element, a causal link, between his protected activity and these adverse actions by his employer.

With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism. Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

23

In the first prong, there must be a close temporal proximity between the protected activity and the adverse employment action. Id. While the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the courts have held that a time span of several months is too great.  See  Williams v. Phila. Hous. Auth., 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation); George v. Genuine Parts Co., No. 04-108, 2007 U.S. Dist. LEXIS 5373 at *34-35 (W.D. Pa. Jan. 25, 2007)(holding that though suggestiveness is highly sensitive to the facts of each case, that a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists.").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case.  See Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link."); Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); but cf. Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where 19 months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); Quiroga v. Hasbro, Inc., 934 F.3d 497 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation).  Timing, however, in connection with other types of suggestive evidence, is clearly sufficient to demonstrate the causal

link. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000). For example, the

court of appeals held that timing combined with evidence of vague or inconsistent reasons given

by an employer for an employee's termination was sufficient to satisfy the causation prong of the

prima facie case. Abramson, 260 F.3d at 289 ("Here, as we found in our discussion of the

discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her

employer] proffered for her termination, and in demonstrating that those reasons were vague and

inconsistent."); Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986); see also

EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir.1997), cert. denied, 522 U.S. 1147

(1998).

     The second adverse action is Comcast's failure to promote B. Carter on two occasions.

The internal discrimination complaint was filed on February 15, 2002. The first supervisory

position opened contemporaneously with the time of B. Carter's complaint. The second position

opened in March 2002, one month after the filing of the complaint. There was a relatively short

time period between the complaint and the opening for each position, but the timing alone in this

case is insufficient to create an inference of causation. See Krouse, 126 F.3d at 503 (3d Cir.

1997)("[T]he timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory

motive before a causal link will be inferred."). The court must look to the "entire record before

us" to determine whether the causation element is met, and weigh such factors as intervening

antagonism, retaliatory animus, and inconsistencies in the employer's articulated reasons for the

adverse employment actions. Farrell, 206 F.3d at 280-84. Defendants assert that the individuals

responsible for selecting the applicants for the positions had no knowledge of B. Carter's internal

complaint. B. Carter presented no evidence from which a reasonable fact-finder could infer that

those individuals had knowledge of the discrimination complaint. Additionally, although B.

Carter set forth a prima facie case of race discrimination within the McDonnell Douglas framework, Comcast rebutted the presumption of discrimination by producing evidence of its legitimate, non-discriminatory business reasons for not promoting plaintiff. As discussed above, B. Carter was unable to proffer sufficient evidence to discredit the employer's legitimate reasons. B. Carter has also not offered sufficient evidence of ongoing antagonism or retaliatory animus on the part of the employer. Plaintiff failed to proffer sufficient evidence for a reasonable fact-finder to infer a causal relationship between B. Carter's protected activity and the failure of B. Carter to be promoted.

The third instance of retaliatory adverse employment action that B. Carter points to is his one-day suspension for call avoidance. The complaint was filed in February 2002 and the suspension occurred four months later in June 2002. This four-month time frame is not sufficient to raise an inference of causation. See Williams, 380 F.3d at 760 (3d Cir. 2004) (two months too long to permit an inference of causation). B. Carter offers no evidence of continuing antagonism or retaliatory animus in the intervening time period. B. Carter maintains that the decision for the one-day suspension was subjectively and arbitrarily made by supervisory personnel. Plaintiff points to no evidence in support of this assertion, and Comcast counters that two other employees who were engaged in the same conduct were disciplined in the same way during the time period. Plaintiff failed to proffer sufficient evidence for a reasonable fact-finder to infer a causal relationship between B. Carter's protected activity and his one-day suspension for call avoidance.

Finally, B. Carter alleges that his termination by Comcast was the culmination of its retaliation for the filing of his complaint. B. Carter filed his complaint in February 2002. Comcast maintains that B. Carter was discharged in a corrective discipline memorandum dated

26

August 26, 2004, which outlined all his performance and behavioral problems leading up to his termination. The time period between the filing of his complaint and his termination was at least two years: a time frame too long to promote an inference of causation based on timing alone. Similar to the one-day suspension, Comcast proffered legitimate non-discriminatory business reasons for its decision to terminate B. Carter. B. Carter offered no evidence of ongoing antagonism prior to his termination to overcome Comcast's legitimate explanations or infer any retaliatory animus. Plaintiff failed to proffer sufficient evidence for a reasonable fact-finder to infer a causal relationship between B. Carter's protected activity and his eventual termination.

B. Carter's claims for retaliation must fail because with respect to the adverse actions he identified either he failed to satisfy the second or third element needed to establish a prima facie case.

## II      R. Carter's third-party retaliation claims

In addition to B. Carter's claims based on race discrimination and retaliation for the filing of an internal complaint with Comcast's human relations department, his spouse, R. Carter, alleges that she was terminated in retaliation for B. Carter's protected conduct. Her claims fail as a matter of law.

A prima facie case of illegal retaliation under the anti-discrimination statutes includes: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; (3) a causal connection between the employee's protected activity and the employer's adverse action." Fogleman v. Mercy Hosp., 283 F.3d 561 (3d Cir. 2002). In its analysis, the court of appeals in Fogleman held that:

> the plain text of the anti-retaliation provisions requires that
> the person retaliated against also be the person who engaged
> in the protected activity: Each statute forbids discrimination
> against an individual because "such individual" has engaged

27

> in protected conduct. By their own terms, then, the statutes do
> not make actionable discrimination against an employee who
> has not engaged in protected activity. Read literally, the statutes
> are unambiguous- indeed, it is hard to imagine a clearer way
> of specifying that the individual who was discriminated against
> must also be the individual who engaged in protected activity.

Id. at 568.

    R. Carter did not allege or present evidence that she engaged in protected activity and, therefore, is precluded from bringing a retaliation claim based upon the protected activity undertaken by her husband.

## Conclusion

Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiffs, and drawing all reasonable inferences in favor of plaintiffs, the court concludes that a reasonable jury could not render a verdict in favor of plaintiffs with respect to their claims under Title VII or the PHRA.  With respect to the race discrimination claims, B. Carter  presented insufficient evidence to establish pretext to overcome Comcast's stated legitimate, non-discriminatory reasons for the adverse employment decisions and with respect to his retaliation claims, he failed to adduce sufficient evidence to establish a prima facie case.  As a matter of law, R. Carter cannot establish a prima facie case of retaliation because it is undisputed that she did not engage in protected activity.  Therefore, summary judgment must be granted in favor of defendant with respect to plaintiffs' Title VII and the PHRA claims.  The clerk shall mark this case closed.

    By the Court,

Dated:  August 29, 2008

    /s/ Joy Flowers Conti
    Joy Flowers Conti
    United States District Judge